**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

GEORGE HAWTHORN,                    )
                                   )
            Plaintiff,              )
                                   )
v.                                 )
                                   )   **CIVIL ACTION NO. 17-488-JB-MU**
GEORGIA PACIFIC BREWTON, LLC, et al.,   )
                                   )
            Defendants.             )

## MEMORANDUM OPINION

This Memorandum Opinion follows the Court's Order dated November 30, 2020 (Doc. 75), on the Motion for Summary Judgment filed by Defendants Georgia-Pacific LLC, Georgia-Pacific Brewton LLC, and Georgia-Pacific Severance Plan for Salaried Employees ("Defendants"). (Doc. 58). The Court concludes that the Motion is due to be granted for the reasons set out herein.

## BACKGROUND

Plaintiff George Hawthorn filed this action under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq. (Doc. 30). The Complaint asserts three causes of action. The first is for "Violation of the ADEA" (*Id.* at 6), the second for "Interference with ERISA Rights" (*Id.* at 8), and the third is a "Claim for ERISA Benefits" (*Id.* at 9).

Defendants move for summary judgment as to all three causes of action. Defendants argue Plaintiff's ADEA claim fails as a matter of law because Plaintiff produces no direct evidence of age discrimination and cannot establish a *prima facie* case under *McDonnell Douglas*. (Doc.

59 at 18).  Defendants also argue Plaintiff was terminated for legitimate, non-discriminatory reasons which Plaintiff cannot demonstrate as pre-textual.  (*Id.* at 23).  Defendants contend they are entitled to summary judgment on Plaintiff's ERISA interference claim because Plaintiff offers only speculative evidence and cannot demonstrate a specific intent to interfere.  (*Id.* at 26).  Defendants move for summary judgment on the claim for ERISA benefits because, they argue, the decision of the Plan Administrator was correct or a reasonable exercise of discretion which was not influenced by a conflict of interest.  (*Id.* at 28).

### DETERMINATIONS OF UNCONTROVERTED FACTS

Defendant Georgia-Pacific Brewton LLC manufactures container board at its mill in Brewton, Alabama ("Mill").  (Doc. 59 at 5).  Plaintiff began working at the Mill in 1977, prior to GP's acquisition of it in 2007.  (Doc. 63 at 2).  Plaintiff was employed by GP on September 28, 2007 as a Shift Supervisor in the Utilities Department.  (Doc. 59 at 3).  Plaintiff held that position until he was terminated on December 2, 2016.  (*Id.* at 12 and Doc. 63 at 2).  Plaintiff was 61 at the time of his termination.  (Doc. 63 at 17).

Defendants' Utilities Department director, Tom Evans, was Plaintiff's supervisor.  (*Id.* at 3).  Lauren Hickman was the HR manager most directly involved in the circumstances giving rise to the Complaint.  (Doc. 59-3).  Megan Sirna, Defendants' Senior Vice President of Human Resources, was the Plan Administrator of the ERISA plan made the basis of Plaintiff's ERISA claims. (Doc. 59-2).

In 2014, Defendants began implementing a reorganization plan of the Utilities Department known as "Project Phoenix."  (Doc. 59 at 9).  Project Phoenix included capital

improvements and a reorganization of hourly and salaried personnel.  (*Id.* and Doc. 63 at 3).

Hourly employees were reduced in number, and from nine to three classified positions:  Control

Room Operator, Field Operator, and Support Operator.  (Doc. 59 at 9).  Project Phoenix also

provided for the elimination of all existing Shift Supervisor positions.  (*Id.*).  There were five Shift

Supervisors at the time, including Plaintiff, Frank Grace, Thomas Cameron, Gerome Brackin, and

Charles Butler.  (*Id.*).  The Shift Supervisor positions were to be replaced by one Performance

Development Leader and two Unit Coaches.  (*Id.*).  Defendants did not notify the Shift Supervisors

of, or otherwise designate, a date when their positions would be eliminated.  (*Id.*).  Cameron and

William Lee (a Georgia Pacific employee from another facility in Mississippi) were ultimately hired

for the two Unit Coach positions.  *(Id.)*.  Plaintiff does not allege Cameron's age, and his age is not

identified elsewhere in the record.

Project Phoenix also implemented new pay rates for newly created positions.  The new

pay rates were to become effective the first pay period of October 2016.  (Doc. 59 at 10).  During

transition to the new positions and pay rates, some employees still worked former positions at

former rates.  If an employee was assigned to work a former position on old equipment, the

employee would be paid at the applicable former rate if it was higher than the applicable new

rate.  (*Id.* at 11).  In such cases, Shift Supervisors were responsible for entering the former rate.

For employees not working on old equipment, no pay rate adjustments were to be made; default

rates entered by Defendants' headquarters applied automatically and Shift Supervisors were not

to make changes.

There was some confusion among the Shift Supervisors as to the application of pay rates under Project Phoenix. (Doc. 63 at 7). Even after implementation of the new rates for the first October 2016 pay period, questions remained. (*Id.*). On October 10, 2016, Hickman emailed instructions to the Shift Supervisors explaining the application of pay rates. (Doc. 63 at 7). Plaintiff found Hickman's email "helpful" and understood the instructions. (Doc. 59 at 11). Plaintiff understood that Shift Supervisors were responsible to determine applicable pay rates for their employees on their shift. (Doc. 59 at 11). If Plaintiff had any doubt about the application of a pay code, he understood that he was to "stop, think, and ask." (*Id.*).

Hickman sent a second email to the Shift Supervisors on October 11, 2016, reminding them that a pay rate was to be changed only if work was performed on old equipment, and that new pay codes should not be entered for an employee unless the employee was certified on all jobs for a position. (*Id. See also* Doc. 63 at 7). Hickman also instructed Shift Supervisors to consult with Evans or GP Performance Development Leader Janice Samuel before setting up a new pay code. (Doc. 59 at 11).

Lavon Bradley was employed in the Utilities Department during the implementation of Project Phoenix. The applicable pay rate for Bradley was addressed in a series of emails between Hickman and Shift Supervisors. Hickman sent an email to Shift Supervisors that indicated Bradley would not be eligible for a higher Control Room Operator ("CRO") pay code. (Doc. 59-3). Shift Supervisor Cameron questioned that instruction and advised Hickman that Bradley's experience was equivalent to others making the CRO rate. Cameron told Hickman that he "would like to see if [Bradley could] be considered for that." (*Id.*). Hickman responded to Cameron, instructing that

Bradley was not to be given the CRO code. (*Id.*). Although Plaintiff did not see Hickman's instruction to Cameron, he understood that Bradley was not to receive the higher CRO rate. (*Id.*).

On November 30, 2016, Plaintiff approved the timecards for the Utilities Department, including Bradley's. (Doc. 59 at 12). Bradley's timecard included the unauthorized CRO pay code, which had been entered by Shift Supervisor Grace. (*Id.* and Doc. 63 at 9). Although Plaintiff disputes that he approved the entry deliberately, he does not dispute that his approval was a mistake.

Cameron detected the mistake in Bradley's timecard and notified Hickman. (Doc. 59 at 12). Plaintiff notified Defendants' HR Manger Chris Payne. (*Id.*). Hickman believed the unauthorized code had been entered deliberately. (Doc. 63 at 10). On November 1, 2016, Hickman and Samuel met with Plaintiff and Grace about the mistaken entry and approval.[1] After that meeting, Payne instructed Hickman to conduct a payroll audit. She did so by reviewing Defendants' payroll records for the month of October 2016. (Doc. 59-3). The new rates took effect in October and Plaintiff approved the November 2016 payroll. (*Id.*). Hickman reviewed the schedules of operators who performed new jobs and, therefore, were to be paid new rates automatically without Shift Supervisor intervention or overriding. The new rates were pre-programmed into Defendants' Kronos system.

Hickman's audit revealed numerous incorrect entries of pay codes for several operators. Her audit findings specified 28 occasions on which Plaintiff had manually overridden new rates and input inapplicable higher old rates for five different operators. Hickman believed that

---

[1] Defendants contend that Payne was also at the meeting, but Plaintiff does not recall Payne being present. (Doc. 59 at 13 and Doc. 63-1).

Plaintiff did so intentionally.  (*Id.*).  Although Plaintiff disputes the substance of Hickman's determination, he does not dispute it was her determination.  Plaintiff disputes that he *intentionally* approved wrong codes.  He does not dispute that he approved wrong codes or that it was Hickman's determination that he did so intentionally.  It is likewise undisputed that Hickman concluded Cameron did not deliberately enter incorrect pay codes.  (*Id.*).  It was Mr. Cameron who notified Hickman when he discovered the mistaken entries.  (*Id.*).

Plaintiff was terminated on December 2, 2016, following Hickman's audit.  Plaintiff was not replaced.  (Doc. 63 at 16).  Defendants contend that his termination was based on Hickman's audit findings, together with his overall employment performance history.  (Doc. 59-5 at 17).  Plaintiff had been counseled for persistent attendance and communication problems, failures to embrace change, mis-handling an employee's return to work, and the scheduling of a vacation to which he was not entitled. (Docs. 59-8, 59-5, 59-9, and 68-6).  Plaintiff's overall performance evaluations declined over the last two years of his employment, to low "Meeting Expectations" ratings.  (Doc. 59-8).  The only record evidence of Cameron's performance evaluations includes ratings from high "Meeting Expectations" increasing to "Exceeding Expectations."   (Doc. 68-2).  Cameron's disciplinary record does not include attendance problems, or the sort of communication and supervisory deficiencies which are a part of Plaintiff's employment history.

**CONCLUSIONS OF LAW**

### A.  Jurisdiction, Venue, and the Summary Judgment Standard

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2).

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate

6

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322 - 23.

Once the moving party has met its burden, the non-moving party must "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). On the other hand, a district court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A reviewing court is restrained during summary judgment

proceedings from making the sort of determinations ordinarily reserved for the finder of fact at a trial. *See Strickland v. Norfolk Southern Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (citations and quotations omitted).  After the non-moving party has responded to the motion for summary judgment, the district court must grant summary judgment if there is no genuine dispute of material fact and the moving party is entitled to a judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *see also Arthur v. Thomas*, 974 F. Supp. 2d 1340, 1343 - 44 (M.D. Ala. 2013).

### B.  Plaintiff's ADEA Claim

#### 1.  Plaintiff has failed to establish a *prima facie* case.

The ADEA prohibits an employer from discharging, or otherwise discriminating against, an employee because of his age if the employee is at least 40 years old.  *See* 29 U.S.C. § 623(a)(1).  "To prevail on an age-discrimination claim, 'a plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision.'" *Ayala v. Lambert*, 594 Fed. Appx. 602, 603 (11th Cir. 2015).

The Plaintiff's evidence is circumstantial.  Therefore, his case is subject to the *McDonnell Douglas* burden-shifting analysis.  *Sims v. MVM, Inc.*, 704 F.3d 1327, 1331-33 (11th Cir. 2013). Under *McDonnell Douglas*, "a plaintiff must first make a *prima facie* case of age discrimination, usually by showing (1) he was a member of a protected age group; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position from which he was discharged; and (4) he was qualified to do the job from which he was discharged."  *Shell v. BellSouth Telecomms., LLC*, 2020 U.S. Dist. LEXIS 100842, at *24 (N.D. Ala. 2020) (citing

*Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015)).  If a plaintiff was not replaced after termination, "he may still satisfy the [third] prong of the *prima facie* case requirement by identifying similarly situated comparators outside of his protected class who were treated more favorably."  *Id.* (quoting *Horn v. United Parcel Servs.*, 433 Fed. Appx. 788, 792 (11th Cir. 2011)).

The Defendants' Motion focuses on the third prong of Plaintiff's *prima facie* case.  It is undisputed that Plaintiff was terminated and not replaced.  (Doc. 63 at 16).  Therefore, the parties join issue on the alternative third prong, i.e., whether Plaintiff has identified a similarly situated comparator outside his protected class who was treated more favorably.  (*See* Defendants' Briefs, Docs. 59 at 19 - 23 and 68 at 2 – 4; and Plaintiff's Brief, Doc. 63 at 20 – 23). Plaintiff bears the burden of proof on this issue.  *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1224 (11th Cir. 2019) ("In order to defeat summary judgment, a Title VII plaintiff proceeding under *McDonnell Douglas* must prove [he] was treated less favorably than 'similarly situated' individuals outside her class.").

Plaintiff contends that Cameron "is a perfect comparator" because "he engaged in  the same basic misconduct as Plaintiff, he was subjected to the same employment policy, guideline or rule as Plaintiff, he answered to the same supervisor as Plaintiff, and he shared the same employment and disciplinary history as Plaintiff."   Assuming at this point that Cameron is "similarly situated," Plaintiff nevertheless failed to offer any proof that Cameron is outside Plaintiff's protected class.  Plaintiff does not allege Cameron's age.  It is "an irreducible requirement of the Title VII analysis that similarly situated comparators must be outside the

plaintiff's protected class." *Johnson v. Mobile Infirmary Med. Ctr.*, 2015 U.S. Dist. LEXIS 44990, at 34 – 35 (S.D. Ala. April 6, 2015).  In *Johnson*, the court emphasized the Eleventh Circuit's language in *Horn*, that a "plaintiff must also point to someone similarly situated (**but outside the protected class**) who disputed a violation of the rule and who was, in fact, treated better.") 2015 U.S. Dist. LEXIS 44990 (emphasis in original (quoting Horn, 433 Fed.Appx. at 794).

Even if Plaintiff had offered evidence that Cameron was outside Plaintiff's protected class, the Court finds that Cameron is not "similarly situated" to Plaintiff.  Under *Lewis*, the Plaintiff bears the burden to establish that Cameron is similar to Plaintiff "in all material respects."  918 F.3d at 1218 ("a plaintiff asserting an intentional-discrimination claim under *McDonnell Douglas* must demonstrate that she and her proffered comparators were 'similarly situated in all material respects.'").  Similarity in "all material respects" does not require a plaintiff to prove that a proffered comparator is identical or "nearly-identical."  *Id.* at 1227. Rather, the standard turns on "substantive likenesses."  *Id.* at 1228.  "Ordinarily, for instance, a similarly situated comparator" will have engaged "in the same basic conduct," "will have been subject to the same employment policy, guideline, or rule as the plaintiff," "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff," and "will share the plaintiff's employment or disciplinary history."  *Id.* at 1227 - 28. The plaintiff and proffered comparator "must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'"  *Id.* (quoting *Young v. UPS*, 575 U.S. 206, 231 (2015)).

The Court finds that Plaintiff and Cameron are distinguishable, both reasonably and readily, based on significant dissimilarities in their misconduct and disciplinary histories.  First, although their misconduct was similar in nature it was substantially dissimilar in extent.  Plaintiff offers evidence of two (2) incorrect time code entries by Cameron but fails to confront Defendants' audit finding that Plaintiff was responsible for wrong pay rates entered for five subordinates on twenty-eight (28) occasions.  The fact that Cameron's misconduct was much less egregious than Plaintiff's undermines Plaintiff's proffer of Cameron as "similarly situated" comparator.  *Hartwell v. Spencer*, 792 Fed. Appx. 687, at *16 (11th Cir. 2019).  The fact that Plaintiff's misconduct was much more frequent than Cameron's constitutes a significant dissimilarity for purposes this analysis.  *Id.  See also Jackson v. Blue Bird Corp.*, 792 Fed. Appx. 706, at *10 (11th Cir. 2019).  The Court finds that there is no reasonable dispute as to these facts, and that they are unaffected by what Plaintiff said or did not say at his November 1, 2016 meeting with Hickman and Samuel.

Further, "[p]roper comparators generally have similar disciplinary records."  *Hill v. Houchens Food Grp., Inc.*, 2020 U.S. Dist. LEXIS 93419, at *17 (S.D. Ala. May 27, 2020).  Plaintiff and Cameron, however, have substantially dissimilar disciplinary records.  Plaintiff's disciplinary record includes persistent and increasing performance problems, continuing through the time of his termination in 2016.  (Docs. 59-8, 59-9, 68-2 and 68-8).  Plaintiff's overall evaluations, declining to low "Meeting Expectations" prior to his termination, stands in sharp contrast to Cameron's evaluations increasing to "Exceeding Expectations" at the time.

Plaintiff has failed to establish a *prima facie* case under the ADEA by his failure to identify a similarly situated comparator outside his protected class.[2]

### 2. Plaintiff has failed to demonstrate pretext.

Even if Plaintiff were able to establish a *prima facie* case under the ADEA, Defendants would still be entitled to summary judgment because they have articulated legitimate, nondiscriminatory reasons for Plaintiff's termination which Plaintiff cannot prove are pretextual. Under *McDonnell Douglas*, if a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to articulate legitimate nondiscriminatory reasons for termination. A defendant's burden here is "exceedingly light." *Stephens v. Ga. Dep't. of Transp.*, 134 F. App'x. 320, 325 (11th Cir. 2005) (citing *Perryman v. Johnson Prods. Co.,* 698 F.2d 1138, 1142 (11th Cir. 1983)). It is "merely one of production; [the defendant employer] need not persuade the court that it was actually motivated by the proffered reasons." *Wascura v. City of S. Miami*, 257 F.3d 1238, 1243 (11th Cir. 2001) (quotations omitted). The Court finds that Defendants have satisfied that burden by its proffer that Plaintiff was terminated due to Hickman's audit findings against the backdrop of Plaintiff's employment performance history.

The burden, therefore, shifts back to Plaintiff to present evidence that Defendants'

---

[2] Plaintiff references the standard set out in *Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011); namely, that a "triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Plaintiff's effort to meet that standard fails. All of the circumstantial evidence offered by Plaintiff, viewed in a light most favorable to him, does not support a reasonable inference of intentional age discrimination on the part of Defendants. In fact, the evidence regarding Plaintiff's age directly is contrary to such an inference. Plaintiff's unsubstantiated speculation is not enough.

proffered reasons for termination are false *and* that discrimination was the real reason for termination.  *See Perry v. Batesville Casket Co., Inc.*, 551 F. App'x. 987, 990 (11th Cir. 2014) (a proffered reason "cannot . . . be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993) (emphasis in original)). Plaintiff cannot satisfy this burden by "showing that [Defendant] was simply incorrect in its decision[.]"  *Perry*, 551 F. App'x. at 990.  Discrimination does not exist, as a matter of law, "if the employer honestly believed that the employee engaged in misconduct, even if it was mistaken in such a belief[.]"  *Id.*  (citing *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991)).

Moreover, Plaintiff "must meet [Defendant's proffered] reason head on and rebut it, and [he] cannot succeed by simply quarreling with the wisdom of that reason." *Perry,* 551 F. App'x at 990 (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)).  This Court's "inquiry, ultimately, 'is limited to whether the employer gave an honest explanation of its behavior.'" *Id.*  In *Elrod*, the Eleventh Circuit described this limited inquiry as follows:

> Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.' *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted).

*Elrod*, 939 F.2d at 1470.

Plaintiff characterizes Defendants' reasons for his termination as limited to his "violation of the Code of Conduct for falsifying payroll records and failing to stop, think, and ask for guidance on payroll codes," and that "Plaintiff admitted to changing pay codes upon request."

13

(Doc. 63 at 23).  Plaintiff disputes that he *knowingly* changed pay rates, and contends he never changed pay rates to a pay code he *knew* to be incorrect.  (*Id.*).  He argues that work schedules "very often did not reflect the work performed on any given day, as work assignments change frequently." (*Id.*).  According to Plaintiff, Defendants had no reason to conclude he acted intentionally, because Kronos pay codes indicated, "to him," that the corresponding employee "worked a job deserving the pay rate." (*Id.*).  Plaintiff also offers as evidence of pretext that "no one had ever been disciplined or terminated for incorrect pay entries before or since." (*Id.*).

The Court finds that Plaintiff failed to satisfy his burden to demonstrate pretext.  First, he fails to confront the whole of Defendants' proffered reasons for his termination.  Defendants proffered more than its conclusion that his coding mistakes were intentional.  Defendants considered this misconduct as contrary to repeated instructions, and against the "backdrop" of his declining performance over the last years of his employment.  (Doc. 59-5).  Although Plaintiff notes that his performance reviews "consistently met expectation" (Doc. 63-1), he does not reasonably account for the undisputed facts of persistent supervisory deficiencies noted in those reviews and that his overall performance rating declined in the last years of his employment.  (*See* Doc. 65-15, Plaintiff's "performance reviews for the past two years have been low-meeting and they document a pattern of action and behavior that are not acceptable," and Plaintiff "failed to modify and/or correct these behaviors.")  There are, in fact, a number of grounds proffered by Defendants for Plaintiff's termination that Plaintiff does not squarely address.  (Doc. 59-5).  This too undermines Plaintiff's argument that no other employee had been terminated for incorrect pay entries.  Plaintiff was not terminated for this alone.  Plaintiff

has not met Defendants' reasons "head on;" he has given them selected glancing blows. *See Chapman*, 229 F.3d at 1030.[3]

Plaintiff argues that Defendants' "honest belief" that he engaged in conduct warranting termination was based "*largely*" on admissions Plaintiff made at his November 2, 2016 meeting with Hickman and Payne; admissions he disputes. The record is clear, though, that Hickman suspected Plaintiff's conduct was intentional prior to that meeting, based in part on previous instructions she sent to Plaintiff, which he understood and found helpful. The Court further finds that Plaintiff's criticisms of Defendants' investigation of him, and the failure to investigate Cameron, amount only to "quarreling" with Defendants' decisions. *See Perry,* 551 F. App'x at 990. Even assuming Plaintiff has made a showing that Defendants' decision was mistaken or based on erroneous facts, he has not shown that Defendants did not have a good faith belief in its decision. *Usry v. Liberty Regional Medical Center, Inc.*, 560 F. App'x 883, 889 (11th Cir. 2014) (pretext is not established by mere proof that a termination decision is mistaken). This is especially applicable to Defendants' determinations of Plaintiff's poor performance. When poor performance is the proffered reason for termination, "the question is not whether [Plaintiff's] performance was *actually* poor, but whether [Defendant] believed [Plaintiff's] performance was poor." *Alvarez v. Royal Atl. Developers, Inc.,* 610 F.3d 1253, 1266 (11th Cir. 2010).

---

[3] Poor work performance is a legitimate reason for discharge. *See Davis v. Cottage Hill Baptist Church*, 1995 U.S. Dist. LEXIS 13288, at *17 (S.D. Ala. Aug. 29, 1995) (finding the plaintiff's poor job performance and previous insubordination legitimate, non-discriminatory reasons for termination); *EEOC v. Kloster Cruise*, 897 F. Supp. 1422, 1424 (S.D. Fla. 1995); *Kotas v. Waterman Broadcasting*, 927 F. Supp. 1547, 1549 (M.D. Fla. 1996) (finding an employer's good faith belief that an employee's performance is unsatisfactory constitutes a legitimate nondiscriminatory reason for termination in an Age Discrimination in Employment Act claim); *Brown v. PSC Indus. Outsourcing, LP*, 2013 U.S. Dist. LEXIS 1189, *34 (N.D. Ala. Jan. 4, 2013) (finding poor job performance as a legitimate reason for termination).

Not only has Plaintiff failed to demonstrate Defendants' proffered reasons were pretextual, he has not shown age discrimination was the actual reason for Defendants' decision. This is fatal to Plaintiff's ADEA claim.  *Perry*, 551 F. App'x. at 990.  In *Usry*, the Eleventh Circuit instructed that an employer "may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  560 F. App'x at 889.  *See also E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000); *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir. 1987); and *Hammons v. Computer Programs and Sys., Inc. (CPSI)*, 2006 U.S. Dist. LEXIS 89952, at *36 (S.D. Ala. Dec. 12, 2006).

## C.  Plaintiff's Claim for Interference with ERISA Rights.

In his second cause of action, Plaintiff claims that Defendants terminated him with the intent to interfere with his ERISA rights.  (Doc. 30 at 8).  Specifically, Plaintiff alleges his termination was a pretense fabricated by Defendants to preclude him from obtaining severance benefits under the Georgia Pacific Severance Plan for Salaried Employees ("Plan").

Section 510 of ERISA prohibits an employer from discharging a participant or beneficiary "under the provisions of an employee benefit plan . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan."  29 U.S.C. § 1140.  The ultimate inquiry for the Court under this claim is whether Defendant "had the specific intent to interfere" with Plaintiff's ERISA rights.  *Keen v. Bovie Med. Corp.*, 2013 U.S. Dist. LEXIS 64999, at *23 (M.D. Fla. May 7, 2013) (quoting *Clark v. Coats & Clark, Inc.,* 900 F.2d 1217, 1222 (11th Cir. 1993)).  Whether an employer intends to interfere with an employee's right to

future benefits requires a factual inquiry into the purpose for the discharge. *Seaman v. Arvida Realty Sales,* 985 F.2d 543, 546 (11th Cir. 1993). This "is a factual inquiry to be answered on a case by case basis." *Arvida*, 985 F.2d at 546. Here, Plaintiff is not required to show that interference was Defendants' sole reason for terminating him, but he must show more than the incidental loss of benefits as a result of termination. *See id.*

Plaintiff's burden to establish a *prima facie* claim under § 510 is "not onerous." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir. 1993). However, Plaintiff must show "that the employer's decision was directed at *ERISA* rights in particular." *Clark,* 990 F.2d at 1224 (citing *Unida v. Levi Strauss & Co.,* 986 F.2d 970, 979 (5th Cir. 1993)). Further, "[w]hile plaintiff need not show that interference with ERISA rights was the sole reason for the discharge, plaintiff must show more than the incidental loss of benefits as a result of a discharge." *Clark*, 990 F.2d at 1222-23. Plaintiff can carry his burden by direct proof of discrimination or by circumstantial evidence under the burden shifting scheme established by *McDonnell Douglas. Id.* at 1223. As Plaintiff offers no direct evidence of discrimination, the Court turns its attention to the *McDonnell Douglas* test.

Circumstantial evidence is found to exist under the *McDonnell Douglas* test if a plaintiff demonstrates a *prima facie* case of discrimination by a preponderance of the evidence. *Clark*, 990 F.2d at 1223. "In the context of a § 510 claim alleging unlawful discharge, a plaintiff may establish a *prima facie* case of discrimination by showing (1) that he is entitled to *ERISA*'s protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination." *Id.* (citing *Turner v. Schering-Plough Corp.,* 901 F.2d

17

335, 347 (3d Cir. 1990*); Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114-15 (2d Cir. 1988)).

To satisfy the last element the plaintiff does not have to prove discriminatory intent but must

introduce evidence that suggests interference with ERISA rights was a motivating factor. *Id.*

(citing *Turner*, 901 F.2d at 348).  The parties agree Plaintiff is entitled to ERISA's protection and

was qualified for his position.   They dispute whether Plaintiff was discharged under

circumstances that give rise to an inference of discrimination.

The ERISA rights at issue were potential severance benefits.  (Doc. 59-2 ).  Here we turn

back to Project Phoenix, including its provisions for the eventual termination of all Shift

Supervisor positions.  Plaintiff disputes Defendants' evidence that the Shift Supervisor positions

were phased out in March 2017.  Plaintiff argues the positions were effectively eliminated within

two weeks of his termination.  To support his argument, Plaintiff points out that three other Shift

Supervisor positions, vacated in close proximity to his termination on December 2, 2016, were

not filled with new employees.   Plaintiff also contends that Cameron, the remaining Shift

Supervisor, assumed the Unit Coach position "days after his [Plaintiff's] termination."  Plaintiff

argues that the close proximity of his December 2, 2016 termination and the supposed

contemporaneous elimination of the Shift Supervisor position establishes a causal connection -

an inference - that the termination was a pretext to avoid paying his severance benefits.

Defendants provide testimony that the Shift Supervisor position had neither been

eliminated, nor had a Termination Date been designated for its elimination, as required by the

terms of the Plan.  Defendants also point out that "but for" his termination Plaintiff would have

remained in his position until the Termination Date.  Defendants contend that Plaintiff's position,

as well as the other vacated Shift Supervisor positions, were not filled after his termination because it would have been unfair to hire a new employee knowing that the position was going to be eliminated at some point in the future. (Doc. 64-8). Defendants also offer testimony that had Plaintiff remained employed efforts would be made to re-assign him to another position in the company. According to Defendants, Plaintiff offers no evidence that he was terminated specifically to interfere with his rights under the Plan, or of circumstances that give rise to an inference of discrimination. Defendants argue again that Plaintiff has failed to demonstrate its reasons for termination were pretextual. The Court finds Plaintiff has failed to offer sufficient evidence, to create a material issue of fact, that Defendants terminated him with the specific intent to avoid payment of severance benefits under the Plan.

Even if Plaintiff could establish a *prima facie* case of interference with his intended ERISA rights, he could not demonstrate Defendants' proffered legitimate, nondiscriminatory reasons for Plaintiff's termination were pretextual and the Defendants were actually motivated to terminate Plaintiff in order to avoid paying the severance benefits. Again, the "pretext analysis focuses on a narrow question: Would the proffered evidence allow a reasonable factfinder to conclude that the articulated reason for the decision was not the real reason?" *Walker v. Prudential Prop. & Cas. Ins. Co.,* 286 F.3d 1270, 1276 (11th Cir. 2002). As discussed, Defendants have proffered evidence that Plaintiff's termination was attributable to misconduct and unsatisfactory performance. (*See* discussion, *supra*, at Section B.2.). There is no genuine issue of material fact as to Defendants' honest belief (whether mistaken or not) that Plaintiff intentionally raised the pay of operators without authorization. Although Plaintiff disagrees with

Defendants' determinations that he performed unsatisfactorily, when poor performance is the reason for termination, "the question is not whether [Plaintiff's] performance was *actually* poor, but whether [Defendant] believed [Plaintiff's] performance was poor." *Alvarez,* 610 F.3d at 1266.

In an attempt to cast Defendants' "real reasons" as pretext, Plaintiff contends Defendants would save money by denying his severance benefits, that no other employees have recovered severance from the Brewton Mill, and that he was terminated for a "pay coding error…is all." Plaintiff did not, however, introduce any evidence that Defendants obtained a significant reduction in benefit expenses as a result of his termination. *See Clark*, 990 F.2d at 1224 (finding, after analyzing five separate employees' claims, no specific intent to interfere with ERISA benefits, and therefore no *prima facie* case, where the savings were either insignificant or nonexistent and the loss of benefits only incidental to other reasons for the terminations). Plaintiff's potential, and somewhat illusory, severance benefits were valued at an estimated $88,000; this amount is hardly significant considering the scale of Defendants' operations. In addition, at the time of Plaintiff's termination, it was not known if Plaintiff would be receiving benefits. Though the Shift Supervisor position within the Utilities Department was to be eliminated at some future date, Payne testified there were "similar positions available throughout the mill that [Plaintiff] could have been placed in or he could have accepted on his own." (Doc. 68-6). The MOA between the employees and the Defendants contemplated employees transferring from the Utility Department to another department. (Doc. 59-2 at 45 - 46). In that case, Plaintiff would not receive severance benefits. In essence, Plaintiff is alleging that the Defendants' actual motive for his termination was to save money which the Defendants

did not know they would be spending at the time of his termination.

Second, Plaintiff has not produced any evidence of employees who should have been paid severance benefits but were not. Plaintiff has produced evidence that the Brewton Mill did not pay any severance benefits under either Payne's tenure as the HR Director (Doc. 64-8) or Hickman's (Doc. 64-4). The time period applicable to Hickman's and Payne's testimony is 2015-2019. Plaintiff did not identify any employee who was owed benefits, but denied them. On the other hand, Defendants do. During this time period, one other employee from the Brewton Mill, in addition to Plaintiff, was denied severance. (Doc. 59-2). Defendants also produce evidence that between 2015 and 2016, no separations at the Brewton Mill fell into the category of job elimination or reduction in force, which would have potentially qualified someone for severance under the Plan. (Doc. 64-7). Finally, Defendants provide evidence that between 2011 and 2016, Defendants and their subsidiaries paid 905 severance claims (Doc. 59-2). Two denials, specific to the Brewton Mill, over five years hardly indicates the Defendants were intentionally interfering with severance benefits and, therefore, specifically intended to interfere with Plaintiff's benefits.

Finally, the evidence Plaintiff offers to demonstrate his termination for violating the Code of Conduct was different from the treatment received by other employees for "violation" of these same rules fails much for the same reason that his ADEA claim fails – his erroneous pay code entries were far more egregious than that of any other employees. Defendants terminated Plaintiff because he admitted (Defendants believed) he adjusted pay rates in direct opposition to company guidance, against a backdrop of poor performance issues. Plaintiff's argument, that others had done as much and suffered less, is unsupported and immaterial. A pretext analysis

does not charge "this Court with evaluating the equities or the soundness of a defendant's personnel practices. 'We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair.  Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.'" *Wascura,* 257 F.3d at 1247.  (citation omitted).

This Court has recognized a plaintiff's last act of misconduct can be the tipping point and the prior events simply "provide context" for her termination:

> Considering all of these record facts, it is clear that the 2001 and 2002 Itz4Me incidents presented in the Douglas Memorandum simply provide context for the Hawkinsville trip, which was the precipitating event for Hammons' termination. Far from firing her for events that happened three years earlier, CPSI merely considered the Hawkinsville trip to be all the more egregious because of the longstanding history of lapses in judgment with Hammons' Itz4Me activities. No reasonable finder of fact could conclude based on the Memorandum's citation of "old news" that the Itz4Me issue was not the real reason for Hammons' firing, but was a mere pretext or subterfuge for age and sex discrimination.

*Hammons v. Computer Programs & Sys.,* 2006 U.S. Dist. LEXIS 89952, *35 (S.D. Ala. Dec. 11, 2006).

*See also Echols v. Bellsouth*, 385 F. App'x 959, 961-962 (11th Cir. 2010) (where evidence indicated employee was terminated for excessive absenteeism that occurred over a period of time, summary judgment in favor of employer as to ERISA interference claim was affirmed).  As with the plaintiff in *Hammons*, Plaintiff cannot present evidence to overcome Defendants' proffered reasons for his termination.

**D. Plaintiff's Claim for ERISA benefits**

Plaintiff's third cause of action is brought pursuant to 29 U.S.C.§§ 1132(a)(1)(B), which permits a participant of an ERISA plan to bring a civil action to challenge the Plan Administrator's denial of benefits and/or to enforce rights under the plan.  Defendants were operating under the Plan at the time of Plaintiff's termination.  (Doc. 59-2).  Under the terms of the Plan, a salaried employee, such as Plaintiff, must remain an "Eligible Employee" through his/her designated Termination Date.  (*Id.*).  The Plan defines "Eligible Employee" as follows:

> an "Eligible Employee" who is "is involuntarily terminated by an Employer for Cause will not be eligible for benefits under this Plan either at the time of actual termination of employment or at his/her Termination Date. For purposes of this Plan, "Cause" includes unacceptable conduct such as theft, dishonesty, insubordination, deliberate destruction of company property, violation of company policy (including, but not limited to, violation of the Code of Business Conduct).

(*Id.*).  The Plan defines "Termination Date" as a date specified by the employer:

> as of which his/her employment will be deemed to have terminated for purposes of this Plan.  In the case of a job elimination, it is the date as of which the Employer determines that the job is ended or will end.  In the case of a facility closure, it will normally be the closure effective date.  In the case of the sale of a facility, it is usually the closing date of the sale.

(*Id.*).

The Plan vests the Plan Administrator with "the exclusive responsibility and complete discretionary authority to control the operation and administration of this Plan, with all powers necessary to . . . to construe the terms of this Plan, to determine status and eligibility for benefits and to resolve all interpretative, equitable and other questions that arise in the operation and

administration of this Plan."  (*Id.*).  Section 16 - 18 of the Plan sets out the applicable procedures

for claims and appeals.   In general, they require the employee who has not received his/her

benefits to make a claim to the HR Director of the division in which he/she worked, here, Payne.

Following an adverse determination, an employee has 60 days to appeal the decision in writing

to the Plan Administrator.  (*Id.*).  An employee may submit documents or arguments in support

of his position and may also examine the Plan and other documents upon which the

determination was based.  The Plan Administrator must issue a decision within 60 to 120 days.

(*Id.*).

Plaintiff, as noted, was terminated for cause on December 2, 2016.  At the time of

Plaintiff's termination, Defendant had not yet designated a Termination Date for the elimination

of the Shift Supervisor positions under Project Phoenix.  (Doc. 59-2 at Ex. A).  On December 26,

2016, Plaintiff made a claim for severance benefits and received the following response from

Payne:

> Your request for severance benefits is denied because
> you were not an "Eligible Employee," as defined in the Plan. Your
> employment did not end solely because of a job elimination, the
> closure of an entire facility, or the sale of a facility as part of a sale
> of assets, as provided in the Plan. Instead, your employment was
> terminated involuntarily  due to a  violation  of the  GP  Code of
> Conduct. Accordingly, no severance benefits are owed.

(*Id.*).

Plaintiff appealed Payne's decision to the Plan Administrator, Sirna.  On November 9,

2017, the Plan Administrator determined Plaintiff's request for severance benefits was due to be

denied for the following reasons:

24

> [Plaintiff]'s position was in the process of being eliminated. However, prior to his termination there was no established Termination Date and Mr. Hawthorn's job had not ended.  Later, [Plaintiff] was terminated because of unacceptable conduct at work, including the violation of the Code of Business Conduct and approving unauthorized pay adjustments for hourly employees.

*(Id.*).  Plaintiff exhausted his administrative remedies.

In this claim, Plaintiff argues that his position was eliminated contemporaneous with his termination, thereby making him an Eligible Employee.  Plaintiff also argues that the Plan Administrator did not undertake a full and fair review.

ERISA does not contain a standard of review for actions brought under § 1132(a)(1)(B) challenging benefit eligibility determinations.  *Oliver v. Aetna Life Ins. Co.*, 55 F. Supp. 3d 1370, 1376 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108-09 (1989) ("Although it is a 'comprehensive and reticulated statute,' ERISA does not set out the appropriate standard of review for actions . . . challenging benefit eligibility determinations.").  However, the Supreme Court has recognized that there are three possible standards:  *de novo*, arbitrary and capricious, and heightened arbitrary and capricious.  *Till v. Lincoln Nat'l Life Ins. Co.*, 182 F. Supp. 3d 1243, 1267 (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 110 - 11 (2008) and *Doyle v. Liberty Life Assurance Co. of Bos.*, 542 F.3d 1352, 1359 (11th Cir. 2008) ("*Glenn* implicitly overrules and conflicts with our precedent requiring courts to review under the heightened standard a conflicted administrator's benefits decision.")).

In *Firestone*, the Supreme Court instructed that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to

construe the terms of the plan." *Firestone,* 489 U.S. at 115.  The arbitrary and capricious standard applies if the plan gives the administrator discretionary authority.  *Till,* 182 F. Supp. 3d at 1267 (citing *Doyle*, 542 F.3d at 1359-60).  The *de novo* standard "offers the highest scrutiny (and thus the least judicial deference) to the administrator's decision."  *Till*, 182 F. Supp. 3d at 1267 (citing *Williams v. Bellsouth Telecomms., Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004)).  The arbitrary and capricious standard "accords the most judicial deference—and the least scrutiny—to the administrator's decision."  *Id.*  The arbitrary and capricious standard applies to "both the administrator's construction of the plan and concomitant factual findings."  *Till*, 182 F. Supp. 3d at 1268 (citing *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1451 (11th Cir. 1997)).

"The Eleventh Circuit has adopted a six-step framework for reviewing ERISA benefits decisions."  *Till*, 182 F. Supp. 3d at 1267 (citing *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011)).  The test is as follows:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end the inquiry and reverse the decision.
>
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Till,* 182 F. Supp.3d at 1267 - 1268 (*citing Blankenship,* 644 F.3d at 1355)).

Based on the terms of the Plan and application of the *de novo* standard, the Court agrees with the decision of the Plan Administrator.  Plaintiff admits that his Shift Supervisor position had not been eliminated  by the Defendants prior to his termination.  (Doc. 59-8 at 140-141).  That admission establishes that Plaintiff was not an "Eligible Employee" under the clear terms of the Plan.  Furthermore, the Plan vests the Plan Administrator with "exclusive responsibility and complete discretionary authority to control the operation and administration of this Plan," including the interpretation of terms and definitions (Doc 59-2).  Therefore, even assuming the Plan Administrator's decision is *de novo* wrong, it is subject to review under the arbitrary and capricious standard.  *Prelutsky v. Greater Ga. Life Ins. Co.*, 692 Fed. Appx. 969, 973 (11th Cir. 2017) (where discretion afforded under the plan, even assuming decision *de novo* wrong, "the dispositive question is whether [the] decision was arbitrary and capricious.  The Court function here "is to determine whether there was a reasonable basis for the [Plan Administrator's] decision, based upon the facts as known to the administrator at the time the decision was made." *Id.*  (quoting *Jett v. Blue Cross & Blue Shield of Ala.*, 890 F.2d 1137, 1139 (11th Cir. 1989)).

Plaintiff argues that he was an "Eligible Employee" because his position was eliminated contemporaneously with his termination.  (Doc. 63 at 29).  Plaintiff's argument is both circular and circumstantial.  The Plan required Defendants to specify a Termination Date for employees

who could not be reassigned (as a result of an employer activity like Project Phoenix) in the event their positions were to be eliminated.  Plaintiff argues that his position was eliminated, however, based on the fact that three other Shift Supervisor positions were not replaced when the employees filling them either quit or were reassigned, all in close proximity to the date of Plaintiff's termination.  Accordingly, Plaintiff contends, the Plan Administrator's decision to deny him severance benefits was arbitrary and capricious.  (Doc. 30).

The Court disagrees.  The facts noted by Plaintiff, taken in the light most favorable to him, do not create a genuine issue of fact concerning whether Defendants eliminated the Shift Supervisor position, much less designated a Termination Date for purposes of the Plan, prior to Plaintiff's termination for cause.  The evidence presented by the Plaintiff simply underscores the undisputed fact that Defendants' Utilities Department was then in flux due to Project Phoenix. Moreover, Plaintiff's summary judgment argument here is contrary to his sworn deposition testimony.  (Doc. 59-8).

Finally, even when a Termination Date had been designated and the Shift Supervisor eliminated, it was not inevitable that Plaintiff would have been separated from the Mill and thereby entitled to severance.  Payne testified that had Plaintiff not been terminated for cause, he could have been transferred to another supervisory position in the Mill.  The prospect for Plaintiff's eventual receipt of severance at the time of his termination was only speculative. (Docs. 68-6 and 68-14).

Under these facts, viewed in the light most favorable to Plaintiff, the Court finds the Plan Administrator's decision was reasonable.  There is no genuine dispute that a Termination Date

had not been designated and that Plaintiff's position had not been eliminated at the time he was

terminated for cause.  The Plan Administrator applied the terms and definitions of the Plan to

the facts of Plaintiff's employment and termination.  Plaintiff was not an "Eligible Employee"

under the plain terms of the Plan.  As long as a reasonable basis appears for the Plan

Administrator's decision, "it must be upheld as not being arbitrary and capricious, even if there

is evidence that would support a contrary decision."  *Seals v. Ret. Plan of Int'l. Paper*, 2012 U.S.

Dist. LEXIS 7642 at *29 (S.D. Ala. Jan. 23, 2012) (quoting *White v. Coca–Cola, Co.*, 542 F.3d 848,

856 (11th Cir. 2008)).  This decision cannot be characterized as arbitrary and capricious, and

therefore the Court will not reverse it.

Plaintiff also contends that the Plan Administrator failed provide a full and fair review of

the decision denying benefits as required by ERISA.  Pursuant to 29 U.S.C. § 1133, an

administrator is required to "afford a reasonable opportunity to any participant whose claim for

benefits has been denied for a full and fair review . . . of the decision denying the claim."  29

U.S.C. § 1133(2); *accord Glazer v. Reliance Standard Life Ins. Co.,* 524 F.3d 1241, 1245 (11th Cir.

2008).  "In order for a review process to be deemed a 'full and fair review,' the procedures must

'[p]rovide for a review that takes into account all comments, documents, records, and other

information submitted by the claimant relating to the claim, without regard to whether such

information was submitted or considered in the initial benefit determination."  *Till,* 182 F. Supp.

at 1260-1261 (*citing* 29 C.F.R. § 2560.503-1(h)(2)(iv)).

A claim that a plan administrator failed to "adequately comply with the procedural

aspects of the applicable statutes and regulations, and '[t]he interpretation of ERISA, a federal

29

statute, is a question of law subject to de novo review.'"  *Boysen v. Illinois Toll Workers, Inc,*

*Separation Pay Plan*, 767 F.App'x 799 (11th Cir. 2019) (quoting *Wilkins v. Mason Tenders Dist.*

*Council Pension Fund*, 445 F.3d 572, 581 (2d Cir. 2006)).  "Because such adherence to statutes

and regulations involves no discretionary call by the plan administrator, 'we owe the plan

administrator no deference.'"  *Id.*  (quoting *Wilkins*, 445 F.3d at 581).

 Plaintiff argues the review of his administrative appeal undertaken by the Plan

Administrator was only cursory.  Specifically, Plaintiff says, the Plan Administrator was unable to

conduct a full and fair review because the record appeared to be missing certain documents to

consider, including his declaration, which states that he did not violate the code of conduct.

Plaintiff argues these documents are necessary to the review process because they challenge the

accuracy of the facts as presented by the Defendant.  In further support of his claim, Plaintiff

argues the administrator did not interview the people who made the decision.  Finally, relying on

*Boysen* again, Plaintiff argues Defendants' Motion should be denied because the appeal record

demonstrates the Plan Administrator "made no real effort to investigate the claims."

 This Court does not believe that to be the case.  The Plan Administrator Declaration lists

out the seven documents she reviewed, one of which was the May 25, 2017, Letter of Appeal

submitted by Counsel on behalf of Plaintiff.  (Doc. 59-2).  The May 25, 2017, letter referenced a

number of exhibits, including Plaintiff's Declaration: "We attach hereto a Declaration by Mr.

George Hawthorn attesting to the key facts referenced herein."  Though the letter was listed, its

exhibits were not listed out separately within the text of the Sirna Declaration, which was true of

other documents on the list.  In short, the evidence indicates the Plan Administrator did have

Plaintiff's declaration, and there is no evidence that she failed to consider it or otherwise conduct a full and fair review.

Plaintiff's reliance of *Boyse*n is misplaced.  In *Boysen*, the defendants failed to provide clear reasons for the plaintiff's termination and appeared to switch, as it suited them, between a termination that occurred "for cause" versus a "job elimination." The Court denied summary judgment because the reason for the denial of the plan benefits had "practical effects" on the review process.  *Boysen,* 767 F.App'x at 809.  Boysen could not oppose the decision due to the unclear reason for his termination.  It was equally impossible to ascertain the scope and extent of the plan administrator's "full and fair review."  *Id.*

Unlike *Boysen*, Defendants' position as to Plaintiff's termination was clearly and consistently communicated.  At the time of his termination, his position had not yet been eliminated and a Termination Date had not been designated, though there were ongoing restructuring efforts in that regard.  Plaintiff properly appealed his decision and submitted additional materials to argue his case.  Defendants acknowledged receipt of these same materials and allowed a deadline to be extended in order to accommodate the Plaintiff's submissions. (Doc. 65-9).  Though Plaintiff is displeased with the decision, there is no evidence to support requiring the Plan Administrator reconsider her review.

Plaintiff next contends the Plan Administrator's decision should be analyzed under the heightened standard of review as addressed in *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105 (2008) because there is a structural conflict of interest.  A structural conflict of interest exists when the administrator of an ERISA plan is responsible for making eligibility decisions and

awarding benefits out of its own funds.  *Blankenship*, 644 F.3d at 1354.  Yet "the presence of a structural conflict of interest [is] an unremarkable fact in today's marketplace."  *Id*. at 1356.  At this last stage of the six-step analysis, the burden remains on Plaintiff to show that the Plan Administrator's decision was arbitrary.  *Id*. at 1355.  Defendants have no obligation to prove that the Plan Administrator's decision was untainted by self-interest.  *Id*.

There is no dispute that the Plan has a structural conflict of interest, given that it is both the administrator of and source of funding for the Plan.  (Doc. 59-2).  Defendants anticipate Plaintiff's concerns regarding the structural conflict:  "Though Plaintiff may argue that GP was incentivized to avoid paying Plaintiff one year of his salary as severance (valued at $88,000), given that the cost of the Project Phoenix reorganization was in the hundreds of millions of dollars, any severance payout to Plaintiff would have been negligible in comparison." (Doc. 59-2).  In response, Plaintiff disputes the source of the severance payout, but does not provide any evidence of that the Plan Administrator improper influenced to render an unfavorable decision, beyond employee bonuses were determined in part on the "profit and loss" of the company.  (Doc. 64-8).

Accordingly, Plaintiff has not demonstrated that the structural conflict of interest influenced Defendants' determination of his claim.  *See Till*, 182 F. Supp. 3d at 1277 (finding the structural conflict has little weight even when the plaintiff insists that because the employees' annual bonuses are based on corporate profitability and a denial of a disability claim adds dollars to the company's bottom line; "While it is true that every dollar not paid to a beneficiary is a dollar saved by [Lincoln] in the short run, other factors and different business

considerations may be in play.")

There is no evidence that the structural conflict of interest played any role in the Plan Administrator's decision to deny Plaintiff's severance in the amount of $88,000. *See Blankenship*, 644 F.3d at 1357 (holding that a potential award of $510,000, not including future medical benefits, was not large enough to be a dispositive factor and noting that "most insurers are well diversified, so that the decision in any one case has no perceptible effect on the bottom line. There is correspondingly slight reason to suspect that they will bend the rules.") (quoting *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004)) (internal quotation marks omitted)."

<u>**CONCLUSION**</u>

Based on the foregoing, Defendants' Motion for Summary Judgment (Doc. 58) is GRANTED.

**DONE and ORDERED** this 17th day of December, 2020.

/s/ JEFFREY U. BEAVERSTOCK
UNITED STATES DISTRICT JUDGE